# UNITED STATES DISTRICT COURT
### for the
Middle District of North Carolina

**FILED**
**JUN 1 4 2018**
IN THIS OFFICE
Clerk U. S. District Court
Greensboro, N.C.
By_____

| | |
|---|---|
| In the Matter of the Tracking of *(Identify the person to be tracked or describe the object or property to be used for tracking)* In the Matter of the Use of a Cell Site Simulator to Locate Cellular Device Assigned Call Number (434) 710-9172 | ) ) ) ) ) ) |

Case No. 1:18 MJ 177

## APPLICATION FOR A TRACKING WARRANT

I, a federal law enforcement officer or attorney for the government, have reason to believe that the person, property, or object described above has been and likely will continue to be involved in one or more violations of ___18___ U.S.C. § _1959,1962__ . Therefore, in furtherance of a criminal investigation, I request authority to install and use a tracking device or use the tracking capabilities of the property or object described above to determine location. The application is based on the facts set forth on the attached sheet.

☑ The person, property, or object is located in this district.

☐ The person, property, or object is not now located in this district, but will be at the time of execution.

☐ The activity in this district relates to domestic or international terrorism.

☐ Other:

The tracking will likely reveal these bases for the warrant under Fed. R. Crim. P. 41(c): *(check one or more)*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

☐ I further request, for purposes of installing, maintaining or removing the tracking device, authority to enter the following vehicle or private property, or both:

☑ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Daniel Chelemer, SA FBI
*Applicant's printed name and title*

Sworn to before me and signed in my presence.

Date: __6/14/2018__

_____
*Judge's signature*

City and state:   Winston-Salem, North Carolina

Joi Elizabeth Peake, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE USE OF A CELL-SITE SIMULATOR TO LOCATE THE CELLULAR DEVICE ASSIGNED CALL NUMBER (434) 710-9172 | Case No. _____<br><br>**Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Daniel P. Chelemer, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 to authorize law enforcement to employ an electronic investigative technique, which is described in Attachment A, to determine the location of the cellular device assigned call number (434) 710-9172 (the "Target Cellular Device").

2.      I am a Special Agent with the Federal Bureau of Investigation, and have been since January 7, 2018. I am currently assigned to the Greensboro Resident Agency, Charlotte Division. Among other things, I am responsible for conducting criminal investigations related to federal crimes that occur in Greensboro, North Carolina, to include illegal narcotic related offenses. During my tenure as an agent, I have received extensive training related to criminal investigations. Prior to joining the FBI, I was employed as a Police Officer in Raleigh, North Carolina. I was a police officer for over six years. As a police officer I investigated numerous crimes to include the sale and distribution of illegal narcotics. I also received extensive training regarding responding to and investigating illegal narcotic sales and distribution offenses. I have also participated in the execution of numerous search and arrest warrants in a variety of criminal investigations.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      One purpose of applying for this warrant is to determine with precision the Target Cellular Device's location. However, there is reason to believe the Target Cellular Device is currently located somewhere within this district because the Target Cellular Device's owner, Kevin Lamont Trent, Jr. (also known as "Bad Ass", or "Gates"), was seen in this district just after 8:00 a.m. this morning. Pursuant to Rule 41(b)(2), law enforcement may locate the Target Cellular Device outside the district provided the device is within the district when the warrant is issued.

5.      Based on the facts set forth in this affidavit, there is probable cause to believe that Trent has violated Title 18, United States Code, Section 1962 (Racketeer Influenced and Corrupt Organizations Act); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); and Title 18, United States Code, Section 924(c) (Possession of Firearm in Furtherance of a Crime of Violence), and Title 18, United States Code, Section 1073 (Unlawful Flight to Avoid Prosecution) among other statutes. Trent was charged with these crimes on June 11, 2018, with the exception of Title 18, United States Code, Section 1073 (Unlawful Flight to Avoid Prosecution), and is the subject of an arrest warrant issued by the Western District of Virginia on June 12, 2018. Law enforcement attempted to locate and arrest Trent at his suspected residence in Danville, Virginia, on June 14, 2018, but Trent was not at the residence.

2

There is probable cause to believe that the Target Cellular Device's location will assist law enforcement in arresting Trent.

6.     Because collecting the information authorized by this warrant may fall within the statutory definitions of a "pen register" or a "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this warrant is designed to comply with the Pen Register Statute as well as Rule 41. See 18 U.S.C. §§ 3121-3127. This warrant therefore includes all the information required to be included in a pen register order. See 18 U.S.C. § 3123(b)(1).

## PROBABLE CAUSE

7.     Law enforcement has learned that, in the summer of 2016, members of the Milla Bloods street gang and the Rollin 60s Crips street gang "tied the flag" in order to facilitate their criminal activities in the Danville, Virginia area at the expense of a rival Bloods gang called the 9-Trey Bloods.[1]  (Although these gangs are normally rivals, there are Milla Bloods members who are related by blood or marriage to Rollin 60s Crips.)  In response, the leader of the 9-Trey Bloods, Stevie Wallace, obtained a "greenlight" (i.e., permission) to kill the head of the Milla Bloods gang, DeShawn Anthony (aka Shon Don), and his second-in-command, Demetrius Staten (aka Truck), since the "tying of the flags" had not been approved or sanctioned by high-ranking Bloods leadership. When Anthony and Staten learned of the "greenlight," they conspired with members of their own gang and members of the Rollin 60s Crips to kill Wallace on August 20, 2016, and in the weeks leading up to it.  Multiple individuals who were present at some of these planning meetings have relayed this information to law enforcement.  These meetings are also reflected in

---

[1]     "Tied the flag" is a gang expression for uniting or conspiring together.

3

private Facebook messenger conversations, which law enforcement has obtained pursuant to federal search warrants.

8.    On August 20, 2016, multiple meetings occurred between members of the Rollin 60s Crips and the Milla Bloods. At least one of these meetings occurred at the apartment of W-1. W-1's apartment is located in the Southwyck Apartment complex, an affordable housing complex in Danville, Virginia. In general, the plan was to have Wallace (and his second-in-command) come to Southwyck Apartments, where various gang members were fanned out around the complex and an adjoining parking lot, armed and prepared to shoot Wallace to death.

9.    At approximately 10:20 p.m., on August 20, 2016, a van drove into the apartment complex, which caused multiple individuals to begin shooting from different directions. Two of these individuals were standing in the window of W-1's apartment, which faces the parking lot. One of the occupants of the van, Christopher Motley, was killed in the gunfire. Neither van occupant was the intended target. One witness has stated that the shooting was broadcast on Facebook Live.

10.   After the murder, the shooters fled from the apartment complex to various locations in and around Danville, Virginia. In the hours and days after the murder, some of the shooters also made efforts to dispose of their firearms. Various individuals assisted the shooters in fleeing the murder scene as well as in disposing of the weapons.

11.   W-2 was interviewed by law enforcement officers after waiving *Miranda* rights. In W-2's first interview with law enforcement, W-2 denied any involvement in the homicide and pointed at other individuals. After W-2 was convicted in Virginia state court for firearms-related charges, W-2 was again interviewed by law enforcement officers. After again waiving *Miranda* rights, W-2 provided information consistent with paragraphs 7-10 of this affidavit, including that

4

W-2 participated in the planning to murder Wallace, along with other individuals, was present at Motley's murder, and, in fact, had also been one of the shooters in that event. W-2 also said Kevin Trent was one of the planners and shooters at the Motley murder.

12. After being arrested on Virginia state felony charges unrelated to this investigation, W-3 waived *Miranda* rights and answered questions from law enforcement officers. During the interview, W-3 provided information consistent with paragraphs 7-10 of this affidavit, including that Kevin Trent was one of the planners and one of the shooters at the Motley murder.

13. A Federal Grand Jury indicted Trent and other co-defendants for violations of the above-referenced statutes on June 11, 2018. The Western District of Virginia issued an arrest warrant for Trent on June 12, 2018.

14. One of Trent's co-defendants is Kanas Trent (Kanas). On June 5, 2018, investigators obtained a recorded Danville City Jail (DCJ) inmate telephone call. The telephone call was between Trent and Kanas, who at the time was incarcerated in the DCJ. The telephone call occurred on June 2, 2018, 9:46 p.m. During the telephone conversation Trent identified his current cellular telephone number to Kanas as (434) 710-9172.

15. On June 8, 2018, Sprint Spectrum, L.P provided subscriber records for call number 434-710-9172 in response to a Federal Grand Jury Subpoena. The records revealed that the subscriber for the account was Mygenika Guy, billing address 18 Noel Avenue, Danville, Virginia, 24541. Trent and Guy are known to be close associates. For example, Trent posted the following on Facebook in March 2017: "Mygenika Guy I love You shorty."

16. On June 14, 2018, law enforcement attempted to arrest Trent in Danville, Virginia, at an address where it was believed he was living based on surveillance and Facebook posts. Trent was not located at the address.

5

17.     W-4, who was interviewed by FBI personnel on June 14, 2018 as law enforcement attempted to locate Trent, reported driving Trent to North Carolina on the morning of June 14, 2018.  W-4 dropped Trent off at an unknown location close to Route 29 near Reidsville, North Carolina, shortly after 8:00 a.m.

18.     W-4 permitted FBI personnel to review her cellular phone call history.  W-4's call history revealed three missed calls from 434-710-9172 on the morning of June 14, 2018, and one accepted call from 434-710-9172 at 10:17 a.m. on June 14, 2018.  W-4 purported not to know the identity of the user of 434-710-9172.

19.     In my training and experience, I have learned that Sprint Spectrum, L.P is a company that provides cellular telephone access to the general public.  I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate at least two kinds of information about the locations of the cellular telephones to which they provide service: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or cell tower/sector records.  E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.  Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected.  These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas.  Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device.  Accordingly, cell-site data is typically less precise that E-911 Phase II data.

6

20.     Based on my training and experience, I know that Sprint Spectrum, L.P can collect E-911 Phase II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on Sprint Spectrum, L.P 's network or with such other reference points as may be reasonably available.

21.     Based on my training and experience, I know that Sprint Spectrum, L.P can collect cell-site data about the Target Cell Phone.

## MANNER OF EXECUTION

22.     In my training and experience, I have learned that cellular phones and other cellular devices communicate wirelessly across a network of cellular infrastructure, including towers that route and connect individual communications. When sending or receiving a communication, a cellular device broadcasts certain signals to the cellular tower that is routing its communication. These signals include a cellular device's unique identifiers.

23.     To facilitate execution of this warrant, law enforcement may use an investigative device or devices capable of broadcasting signals that will be received by the Target Cellular Device or receiving signals from nearby cellular devices, including the Target Cellular Device. Such a device may function in some respects like a cellular tower, except that it will not be connected to the cellular network and cannot be used by a cell phone to communicate with others. The device may send a signal to the Target Cellular Device and thereby prompt it to send signals that include the unique identifier of the device. Law enforcement may monitor the signals broadcast by the Target Cellular Device and use that information to determine the Target Cellular Device's location, even if it is located inside a house, apartment, or other building.

7

24.     The investigative device may interrupt cellular service of phones or other cellular devices within its immediate vicinity. Any service disruption to non-target devices will be brief and temporary, and all operations will attempt to limit the interference with such devices. In order to connect with the Target Cellular Device, the device may briefly exchange signals with all phones or other cellular devices in its vicinity. These signals may include cell phone identifiers. The device will not complete a connection with cellular devices determined not to be the Target Cellular Device, and law enforcement will limit collection of information from devices other than the Target Cellular Device. To the extent that any information from a cellular device other than the Target Cellular Device is collected by the law enforcement device, law enforcement will delete that information, and law enforcement will make no investigative use of it absent further order of the court, other than distinguishing the Target Cellular Device from all other cellular devices.

## AUTHORIZATION REQUEST

25.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41. The proposed warrant also will function as a pen register order under 18 U.S.C. § 3123.

26.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days from the end of the period of authorized surveillance. This delay is justified because there is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cellular Device would seriously jeopardize the ongoing

8

investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). There is reasonable necessity for the use of the technique described above, for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

27.     I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the Target Cellular Device outside of daytime hours.

28.     A search warrant may not be legally necessary to compel the investigative technique described herein. Nevertheless, I hereby submit this warrant application out of an abundance of caution.

Respectfully submitted,

Daniel P. Chelemer
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
On: __6 / 14 / 2018__

JOI ELIZABETH PEAKE
UNITED STATES MAGISTRATE JUDGE

9

## ATTACHMENT A

This warrant authorizes the use of the electronic investigative technique described in Attachment B to identify the location of the cellular device assigned phone number (434) 710-9172, whose wireless provider is Sprint Spectrum, L.P., subscribed to by Mygenika Guy, currently used by Kevin Lamont Trent, Jr., who is the subject of the criminal investigation.

## ATTACHMENT B

Pursuant to an investigation of Kevin Lamont Trent, Jr. for a violation of Title 18, United States Code, Section 1962 (Racketeer Influenced and Corrupt Organizations Act); Title 18, United States Code, Section 1959 (Violent Crimes in Aid of Racketeering); and Title 18, United States Code, Section 924(c) (Possession of Firearm in Furtherance of a Crime of Violence), and Title 18, United States Code, Section 1073 (Unlawful Flight to Avoid Prosecution), among other statutes. This Warrant authorizes the officers to whom it is directed to determine the location of the cellular device identified in Attachment A by collecting and examining:

1. radio signals emitted by the target cellular device for the purpose of communicating with cellular infrastructure, including towers that route and connect individual communications; and

2. radio signals emitted by the target cellular device in response to radio signals sent to the cellular device by the officers;

for a period of thirty days, during all times of day and night. This warrant does not authorize the interception of any telephone calls, text messages, other electronic communications, and this warrant prohibits the seizure of any tangible property. The Court finds reasonable necessity for the use of the technique authorized above. *See* 18 U.S.C. § 3103a(b)(2).

The following restrictions apply:

1. Officers must make reasonable efforts to minimize the capture of signals emitted from cellular telephones other than the device identified in Attachment A.

2

2. Officers must immediately destroy all data other than data for the cellular device identified in Attachment A. Destruction must occur within 48 hours after the data is captured, and verification of such must be included in the warrant return.

3. Officers are prohibited from using any data required beyond that necessary to determine the location of the cellular device identified in Attachment A.